**Gregory CAMPBELL, Plaintiff–Appellant/Cross–Appellee,**

v.

**R.W. TOWSE, Individually and as Mayor of the City of Alton, Illinois, Defendant–Appellee,**

and

**Sylvester Jones, Individually and as Chief of Police of the City of Alton, Illinois, and City of Alton, Illinois, Defendants–Appellees/Cross–Appellants.**

**Nos. 95–2949, 95–3400.**

United States Court of Appeals, Seventh Circuit.

Argued April 8, 1996.

Decided Oct. 29, 1996.

Richard D. Frazier (argued), Fred Schlosser, Metnick, Wise, Cherry & Frazier, Springfield, IL, for Gregory Campbell in No. 95–2949.

Christine L. Olson, D. Kendall Griffith (argued), Hinshaw & Culbertson, Chicago, IL, William F. Kopis, Hinshaw & Culbertson, Belleville, IL, for Sylvester Jones in both cases.

Frederick J. Hess (argued), Lewis, Rice & Fingersh, L.C., Belleville, IL, for R. W. Towse.

William L. Hanks, Keefe & Depauli, Fairview Heights, IL, for City of Alton, Illinois.

Richard D. Frazier (argued), Fred Schlosser, Thomas W. Patton, Metnick, Wise, Cherry & Frazier, Springfield, IL, for Gregory Campbell in No. 95–3400.

Christine L. Olson, D. Kendall Griffith, Hinshaw & Culbertson, Chicago, IL, William F. Kopis, Hinshaw & Culbertson, Belleville, IL, William L. Hanks, Keefe & Depauli, Fairview Heights, IL, for City of Alton, Illinois in No. 95–3400.

Before POSNER, Chief Judge, and ROVNER and EVANS, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Gregory Campbell, a lieutenant with the City of Alton Police Department (Department) in Alton, Illinois, was suspended with pay for nine days after he wrote a letter to Chief of Police Sylvester Jones asking to be relieved of his position as Commander of the Bureau of Field Services and to be reassigned to another position. In the letter, Campbell stated that he disagreed with the "management style" and "law enforcement philosophy" of the Department as administered by Jones, that he had grave doubts about the wisdom of Jones' decision to institute a community-oriented policing program known by the acronym "C.O.P.S.,"[1] and that he objected to the way the C.O.P.S. program was being carried out because he believed that the needs of the nonminority residents of Alton were being slighted. Following the suspension, Campbell filed suit in state court under 42 U.S.C. § 1983, alleging that the defendants had retaliated against him for exercising his First Amendment right to express his views on a matter of public concern. Campbell sought compensatory and punitive damages from Jones and the Mayor of Alton, R.W. Towse, for the violation of his rights. Campbell also asserted several state law claims that are not at issue here. The defendants removed the case to federal district court and filed various dispositive motions. The district court ultimately entered judgment for the defendants on all of Campbell's claims. In this appeal, Campbell challenges the district court's grant of summary judgment in favor of the defendants on his First Amendment claim; Jones and the City of Alton in turn contest the court's decision to assess attorneys' fees against them for missing the deadline for filing dispositive motions. For the reasons that follow, we affirm summary judgment with respect to Campbell's claim, and reverse the award of attorneys' fees to Campbell's counsel.

## I. BACKGROUND

At the time that he was suspended with pay, Campbell had been a police officer with the Department for nearly fifteen years, having been promoted to the rank of sergeant in June 1986 and lieutenant in June 1989. Shortly after Jones became Chief of Police in May 1993, he chose Campbell to be Commander of the Bureau of Field Services. In that position, Campbell's primary responsibility was to coordinate the activities of the Traffic Division and the Patrol Division so as to ensure that a sufficient number of police officers were assigned to serve the needs of

---

1. At various points in the record, the community-oriented policing program and concept are also referred to as "COP," or "C.O.P."

each area. Immediately before being selected bureau commander, Campbell had been a watch commander, and thus had been responsible for coordinating the duties of a significantly smaller number of police officers. Although Campbell and Jones had little personal contact on a day-to-day basis, Campbell was expected to be present at meetings of Jones' command staff and to play a role in advising Jones on various issues of departmental policy.

Shortly after his appointment as Chief of Police, Jones instituted the C.O.P.S. program, which provided extra police patrols to the two or three areas of Alton with the highest rates of serious crime. Implementation of the C.O.P.S. program thus entailed diverting police officers from other areas of Alton to the areas targeted for the most vigorous patrolling. It was Campbell's understanding that a significant number of officers assigned to work under his command in the Patrol Division would be transferred to the C.O.P.S. program. During the summer of 1993, Campbell had several discussions with Jones regarding the shortage of police officers assigned to the Patrol Division, and he expressed his concern that the number of officers in that division had fallen to dangerously low levels. Although at that time Campbell had not yet indicated to Jones that he was opposed in principle to the C.O.P.S. program, he did express his dissatisfaction with Jones' decision to adopt the program to other officers, some of whom conveyed the information to Jones. In the early fall of 1993, Jones asked Campbell to prepare a grant application to obtain funds for the purpose of hiring new police officers to be assigned to the C.O.P.S. program. After approximately four to six weeks, Jones asked Campbell where things stood with the application, and Campbell informed him that he had not completed it. Jones later completed the application himself.

On October 25, 1993, shortly after informing Jones that he had not completed the grant application, Campbell delivered the following memorandum (dated October 22, 1993) to Jones:

I respectfully request to be relieved of my current assignment as Commander of the Bureau of Field Services, and reassigned to a Watch Commander's position in the Patrol Division.

Also, it has become increasingly evident to me that we have a big conflict with regard to management style and law enforcement philosophy. Perhaps COP is the wave of the future; but I remain unconvinced that a Police Department of our size can implement the wide program changes that you envision. So far there is no indication that your program for the future is targeted for any segment of the community outside minorities. There are a lot of other people out there with problems also, and I think they are going to be ignored under this administration.

I would think it to be in your best interest, to have a person in my current position who understands, agrees with, and enthusiastically supports what you are attempting for this Department and community; I am not that person!

Please give my request serious and immediate consideration.

> /s/
> Lt. Greg Campbell
> Commander
> Bureau of Field Services

(R. at 31, Amended Complaint Ex. A.)

In response, Jones sent Campbell a written memorandum dated October 26, 1993, in which Jones reaffirmed his support for community-oriented policing, noting that it had been endorsed by various professional law enforcement associations as a means of reducing crime. Jones also expressed his surprise and displeasure that an officer "of [Campbell's] stature and experience" would assert that he could not support the course Jones had set for the police department. Jones' memorandum then posed the following questions to Campbell:

Inasmuch as you have stated that you are unable to "agree with and enthusiastically support" this program, my question to you is how can you continue to function adequately in any position of authority with an opposing view point [sic] particularly in the patrol division.

In my opinion, all supervisors and commanders will be involved in implementing and executing the program. Please give this response serious and immediate consideration. I will forward a copy of your request to Mayor Towse along with a copy of this response.

(*Id.*, Ex. B.)

Not having received a reply, on November 1, 1993 Jones summoned Campbell to his office, ordered Campbell to respond to the questions he had posed, and informed Campbell that he was suspended with pay until their disagreement was resolved. Jones followed his oral order with another memorandum to Campbell, confirming that Campbell was suspended with pay "pending resolution of your opposing views," and stating that he expected Campbell to answer Jones' query concerning his ability to function in any position of authority within the Department given his lack of support for the community policing program that Jones was determined to implement. (*Id.*, Ex. C.) Jones also informed Campbell that failure to obey Jones' order could result in disciplinary action. (*Id.*) Copies of this memo were forwarded to Mayor Towse and the city attorney.

Within four days of receiving this order, Campbell provided a detailed written explanation to Jones concerning specific problems he had encountered with the C.O.P.S. program, and gave several suggestions for improving it. He continued, however, to voice his opposition to Jones' adoption of the program in its present form. Campbell apologized to Jones for the misunderstanding his initial memorandum had created between them, and asserted his willingness to continue to serve the community in his current position if Jones so desired, despite preferring to be reassigned to his former position with the Patrol Division. Campbell's memorandum also contained the following paragraph:

I do consider this exchange of memorandum [sic] to be unfortunate in that certain of the documents have been given to the press. As you know, I did not do that. Honest disputes and differences of opinion among management are best solved internally, and publication of memos and personnel matters only complicates the resolution of these issues. I am concerned about the release of these documents and believe that is a problem that needs to be addressed.

(*Id.*, Ex. D.) Upon receiving this latest missive, Jones wrote back to Campbell that he accepted Campbell's apology, and that he was directing Campbell "to return to duty as patrol shift commander on November 10, 1993," thus honoring Campbell's request to be relieved of his current post and reassigned to the Patrol Division. (*Id.*, Ex. E.)

On May 26, 1994, Campbell filed a complaint in state court against Jones, Mayor Towse, and the City of Alton, alleging that the defendants had violated Campbell's First Amendment rights by suspending him from the police force for nine days in retaliation for expressing his "philosophical disagreement" with the concept of community-oriented policing, and his skepticism that it could ever prove to be an effective means of controlling crime in Alton. Campbell further alleged that his suspension constituted a retaliatory discharge under state law, and that Jones and Towse had intentionally inflicted emotional distress upon him by their conduct. As relief, he sought compensatory and punitive damages from all the defendants. The Mayor and the City filed a notice of removal on June 8, 1994, followed by a joint motion to dismiss Campbell's complaint. Jones later filed a motion to dismiss the complaint as well. In light of the fact that Campbell's original complaint was filed in state court, and thus did not conform to the requirements of the federal rules, the district judge granted Campbell leave on March 14, 1995 to file an amended complaint and dismissed as moot the defendants' motions. Campbell then filed an amended complaint on April 3, 1995, asserting the same claims as he had advanced in his original complaint and appending as exhibits the memoranda he and Jones had exchanged.

The district court set June 10, 1995 as the deadline for all parties to file dispositive motions. Jones and the City of Alton filed motions to dismiss Campbell's amended complaint in mid-April 1995, and Towse filed a motion for summary judgment on May 11,

1995. On August 1, 1995, the district court granted Towse's motion for summary judgment, holding that Campbell's initial memorandum to Jones (dated October 22, 1993) was facially insubordinate and that its foreseeable effect was to impair departmental discipline, and so, too, the efficiency of the public services that the police department is charged with performing. The judge then concluded that the interests of the police department in maintaining harmonious working relationships outweighed Campbell's interest in voicing his opposition to the C.O.P.S. program. *See Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Yet the court simultaneously denied the other two defendants' motions to dismiss. The district court's rationale for taking this course was that Campbell's First Amendment claim could not be rejected as legally insufficient because the speech that was alleged to have resulted in Campbell's suspension did indeed touch upon a matter of public concern, and was thus arguably protected. According to the district court, Campbell's complaint could only be disposed of, if at all, on a motion for summary judgment on the basis of a *Pickering* analysis. Viewing the latter inquiry as one involving a mixed question of law and fact, the district judge thought it inappropriate to decide the issue on a motion to dismiss.

On August 2, 1995, Jones and the City of Alton requested leave to file motions for summary judgment, which the court allowed. The motions were filed the following day and were granted. The judge concluded, however, that the motions had been filed in a dilatory fashion, and ordered Campbell's counsel to submit an affidavit in support of sanctions and a bill for the time he had spent between August 1 and August 3, 1995 preparing for trial. The judge then awarded attorneys' fees to Campbell's counsel in the amount of $5,332.64, assessing one-half the sum against Jones and one-half against the City of Alton.

## II. DISCUSSION

■ Campbell contends that he was suspended in retaliation for his memorandum of October 22, 1993, in which he expressed doubts concerning the efficacy of the C.O.P.S. program in combatting crime, a matter of significant concern to the residents of Alton. Campbell further contends that his interest in expressing his views outweighed the defendants' interest in promoting harmony in the workplace and discouraging criticism of the Department's policies. He therefore maintains that the district court erred in awarding summary judgment to the defendants on the ground that his speech was not protected from reprimand by his employer under the *Pickering* balancing test. We review *de novo* the grant of summary judgment in the defendants' favor, construing the evidence in the light most favorable to Campbell and according him the benefit of all reasonable inferences that may be drawn from it. *Cliff v. Board of School Comm'rs of Indianapolis,* 42 F.3d 403, 408 (7th Cir.1994). The question whether speech is on a matter of public concern is one for the judge, *id.* at 409, as is the balancing of the respective interests of the speaker and his public employer, *Dishnow v. School Dist. of Rib Lake,* 77 F.3d 194, 198 (7th Cir.1996).

■ In determining whether a public employee's speech is entitled to First Amendment protection against retaliation by his employer, we apply the familiar *Pickering–Connick* analysis to which we have already alluded. We first consider whether the speech that motivated the employer's reprimand addressed a matter of public concern, and if so, whether the speaker's interest in his expression was "outweighed by any injury the speech could cause to 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Waters v. Churchill,* 511 U.S. 661, ——, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994) (quoting *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983), and *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734) (internal quotations omitted) *see Mt. Healthy City School Dist. Board of Educ. v. Doyle,* 429 U.S. 274, 284–86, 97 S.Ct. 568, 574–76, 50 L.Ed.2d 471 (1977); *Smith v. Fruin,* 28 F.3d 646, 650 (7th Cir.1994), *cert. denied,* —— U.S.

——, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995).[2] Our threshold inquiry thus involves deciding whether Campbell's October 22 memorandum addressed a matter of general concern to the public, rather than being wholly centered on a personal dispute or grievance with his employer. In making this assessment, we keep in mind that individual employee disputes or grievances, although they certainly qualify as "speech," are not constitutionally protected because they are deemed too "remote from the [First Amendment's] central purpose of protecting the public marketplace in ideas and opinions" to warrant judicial interference with the public employer's personnel decisions. *Eberhardt v. O'Malley,* 17 F.3d 1023, 1026 (7th Cir.1994) (citing *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690); *see Dishnow,* 77 F.3d at 197; *Cliff,* 42 F.3d at 409.

Our analysis of the October 22 memorandum focuses on its "content, form and context," examined in light of the record as a whole, *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690, with content being the most important of these. *E.g., Fruin,* 28 F.3d at 651. Moreover, although Campbell's motive in submitting the memorandum to Jones is not dispositive, our consideration of his motive may well serve to clarify the central point of his expression, and thus to assist us in determining whether he sought to air his criticism of the C.O.P.S. program because he was concerned as a citizen about the weaknesses he perceived in that program, or whether the central point of Campbell's speech was instead "to further some purely private interest" arising out of his employment relation with the Department. *Id.* (quoting *Linhart v. Glatfelter,* 771 F.2d 1004, 1010 (7th Cir.1985)) (internal quotations omitted); *see Cliff,* 42 F.3d at 409–10. At the same time, the fact that Campbell had a personal stake in expressing his views does not, by that reason alone, remove his expression from First Amendment protection under *Connick. Wright v. Illinois Dept. of Children & Family Services,* 40 F.3d 1492, 1501 (7th Cir.1994); *Breuer v. Hart,* 909 F.2d 1035, 1038–39 (7th Cir.1990). Nor would the fact that Campbell made his views known in a private rather than public setting, and even expressed dismay that some of his remarks had been released to the local press, necessarily lead us to conclude that his speech is unprotected. *See Givhan v. Western Line Consolid. School Dist.,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979) (First Amendment rights are not "lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public"); *Wright,* 40 F.3d at 1501–02; *Fruin,* 28 F.3d at 652. Yet where considerations of motive and context indicate that an employee's speech raised a topic of general societal interest merely for "personal reasons rather than a desire to air the merits of the issue," *Fruin,* 28 F.3d at 652, or for the sole purpose of "bolster[ing][his] own position in a private personnel dispute with [his] superiors," *Cliff,* 42 F.3d at 411, these factors militate against the conclusion that the employee's speech is entitled to First Amendment protection. *Id.; Fruin,* 28 F.3d at 653; *see Marshall v. Porter County Plan Comm'n,* 32 F.3d 1215, 1219 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1111, 130 L.Ed.2d 1076 (1995).

We begin, then, with the content of the memorandum. In addition to requesting an immediate transfer from his current post and a reassignment to his previous position in the Patrol Division, Campbell expressed deep skepticism that the Department was sufficiently large to withstand "the wide program changes" that were required to implement the C.O.P.S. program. (R. at 31, Amended Complaint Ex. A.) He then went on to assert that "[s]o far there is no indication that your program for the future is targeted for any segment of the community outside minorities. There are a lot of other people out there with problems also, and I think they are going to be ignored under this administration." (*Id.*) Campbell's memorandum thus questions whether Jones' adoption of the C.O.P.S. pro-

---

**2.** We note at the outset that, although the defendants assert that Campbell's speech was not constitutionally protected, they nonetheless concede that Campbell has raised a factual issue concerning whether his speech (rather than his failure to respond promptly to Jones' memorandum of October 26, 1993) motivated the nine-day suspension, thus precluding summary judgment on that ground. *Cf. Mt. Healthy,* 429 U.S. at 286–87, 97 S.Ct. at 575–76.

gram was in the interest of the nonminority members of the Alton community, as well as whether its implementation would be feasible in a department the size of Alton's.

As a general matter, speech that addresses questions of public safety and police protection has been recognized as involving matters of vital public concern. *Auriemma v. Rice,* 910 F.2d 1449, 1460 (7th Cir.1990), *cert. denied,* 501 U.S. 1204, 111 S.Ct. 2796, 115 L.Ed.2d 970 (1991); *Cromer v. Brown,* 88 F.3d 1315, 1327 (4th Cir.1996); *see also Fikes v. City of Daphne,* 79 F.3d 1079, 1084 (11th Cir.1996); *Watters v. City of Philadelphia,* 55 F.3d 886, 892–93 (3d Cir.1995). Issues involving the proper allocation of police patrols and other departmental resources to various communities in a city are questions of serious public import that one would usually expect to benefit from a full airing in the "public marketplace of ideas and opinions." And where, as here, the speaker is an officer with substantial experience in managing police personnel, that speaker's viewpoint concerning reforms in the organization of police patrolling, and his belief (erroneous or not) that those reforms carry a risk of compromising the department's ability to assure the safety of all segments of the public, are generally issues of significant interest to the community at large.

■ Towse, however, maintains that Campbell's motive in writing the memorandum was entirely personal, that he did not seek a public airing of his views, and that Campbell brought up the issue of his disagreement with Jones' leadership of the Department only to ensure that he would be promptly relieved of his position in the command structure of the Department. Towse is correct that an employee who expresses himself on a subject that may well be of concern to the public, but does so for the sole purpose of bolstering his own position in a personnel dispute, perhaps in the belief that the First Amendment would thereby shield otherwise unprotected speech from the public employer's reprimand, generally fails to satisfy our threshold inquiry under *Connick.* *E.g., Cliff,* 42 F.3d at 410–11 (if speech pertains to matter of public interest but the expression addresses only the personal effect

of that issue on the employee, speech is not on matter of public concern); *Marshall,* 32 F.3d at 1219 (same); *Fruin,* 28 F.3d at 651–52 (where complaints are personal in nature, and employee speaks only "on his own behalf and in his own interest," speech is not on matter of public concern); *Linhart,* 771 F.2d at 1010 ("[*Connick*] requires us to look at the *point* of the speech in question") (emphasis in original). Yet if we construe the memorandum and the other record evidence in the light most favorable to Campbell, it seems apparent that Campbell's criticism of the C.O.P.S. program was not merely an extraneous issue that he raised in order to bolster his position in what was essentially a personal grievance. Instead, his disagreement with the wisdom of bringing the C.O.P.S. program to Alton, and its efficacy in serving the nonminority members of the Alton community, were at the heart of his dispute with Jones and his disapproval of Jones' leadership of the Department. Rather than voicing his opinions about the problems he perceived with the new program in order to gain some personal advantage, it was his conviction that the program would not work that motivated his desire to be transferred to a position where, in his view at least, he would no longer be responsible for assisting Jones in administering the program. Campbell was thus willing to give up his recent promotion in order to disassociate himself from the C.O.P.S. program, and the memorandum was written with that purpose in mind. Viewing the memorandum favorably to Campbell, then, we find that one could reasonably conclude that the central point of Campbell's speech was aimed at a matter of public rather than private concern within the meaning of *Connick* and *Pickering.* *Cf., e.g., Linhart,* 771 F.2d at 1010–11.

■ Our next step is to determine whether Campbell's memorandum so undermined the Department's interest in avoiding disruption of its command structure that Jones' suspension of Campbell was permissible under the First Amendment. *See Connick,* 461 U.S. at 149–50, 103 S.Ct. at 1691; *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734; *Dishnow,* 77 F.3d at 197. We have recognized a number of factors as relevant to

arriving at a proper balance of these competing interests, including whether the speech or expression was reasonably likely to create problems in discipline or cause disharmony, whether the employment relationship ostensibly undermined by the speech was one where personal loyalty and confidence are essential, and whether the speech impeded the employee's ability to perform his duties. *Wright*, 40 F.3d at 1502; *Glass v. Dachel*, 2 F.3d 733, 742 (7th Cir.1993) (collecting cases); *see Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987). These factors are not, moreover, considered in a vacuum, but must be placed in "the context in which the underlying dispute arose." *Wright*, 40 F.3d at 1502; *see Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899.

█ In assessing whether Campbell's interest in his expression was outweighed by Jones' interest in maintaining the efficient operation of the Department, we are not unmindful of the fact that one purpose of the *Pickering* balance is to "ensure that public employers do not use [their] authority ... to silence discourse [on matters of public concern], not because it hampers public functions but simply because [they] disagree with the content of employees' speech." *Rankin*, 483 U.S. at 384, 107 S.Ct. at 2896. Campbell makes much of the fact that one of Jones' written replies to Campbell's October 22 memorandum stated that Campbell was suspended with pay "pending resolution of your opposing views." (R. at 31, Amended Complaint Ex. C.) Campbell contends that this statement shows that Jones' suspension of him was purely aimed at punishing him for his "philosophical differences" with Jones over the wisdom of instituting the C.O.P.S. program. Campbell thus offers a very simplistic view of the facts of this case, as he ignores the context in which the speech occurred. Indeed, our review of the record as a whole, even when viewed in the light most favorable to Campbell, leaves us convinced that Jones' interest in maintaining authority over departmental personnel, and in being assured that his commands would be respected by Campbell, clearly outweighed Campbell's interest in expressing his views.

After Campbell submitted the October 22 memorandum to Jones, Jones recognized that it could be indicative of insubordination. That Jones was immediately concerned about what Campbell really meant in sending the memorandum was entirely reasonable on Jones' part, considering that Jones had heard from other officers that Campbell disagreed with Jones' adoption of the C.O.P.S. program, and also considering that Campbell had been lethargic, to say the least, about completing a grant application for funding to hire new police officers for the program, as he had been ordered to do by Jones. So Jones sought assurances from Campbell. In a written memorandum he delivered to Campbell one day after receiving Campbell's missive, Jones pointed out that he considered all supervisory personnel to be involved in implementing the C.O.P.S. program, and queried Campbell as to how Campbell expected to be able to function in his former position as a watch commander if he was unable to support the program. Jones also requested an immediate reply to his concerns. Five days passed without any word from Campbell. At this point, it was entirely reasonable for Jones to lose confidence in Campbell, to begin to doubt Campbell's loyalty, and to conclude that the memorandum was not merely an expression of a "philosophical disagreement," but that it had indeed been insubordinate, that is, that the memorandum indicated a significant reluctance on Campbell's part to accept Jones' leadership of the Department. *See Waters*, 511 U.S. at ——, 114 S.Ct. at 1886–89. Jones then suspended Campbell with pay, and made it clear to Campbell that he was being ordered to reply to the questions Jones had raised in his initial memorandum. Furthermore, as soon as Campbell apologized for the insubordinate aspects of his October 22 memorandum and assured Jones that he accepted Jones' command authority, he was reinstated to the position he had originally requested in that memorandum, despite his continued disagreement with the wisdom of adopting C.O.P.S., and his criticism of how it had been implemented.

█ It surely cannot be doubted that individuals who work in the highest echelons of the command of a police department must

be assured of the loyalty of their immediate subordinates, as these subordinates are entrusted with carrying out their orders, at times under the most trying conditions. *E.g., Breuer,* 909 F.2d at 1041 (noting "particularly urgent need for close teamwork" in field of law enforcement) (collecting cases); *Moore v. City of Wynnewood,* 57 F.3d 924, 934 (10th Cir.1995) (need for discipline, personal loyalty and harmony among co-workers is "particularly acute" in context of law enforcement). In this case, Campbell's memorandum caused Jones to doubt that loyalty, and Campbell's subsequent actions did nothing to dispel Jones' doubt but instead augmented it. Because Campbell's interest in expressing himself as he did was thus decisively outweighed by Jones' interest in maintaining control over the Department and preserving departmental discipline and cohesion, Jones' suspension of Campbell did not violate Campbell's First Amendment rights.[3]

■ Two of the defendants, Jones and the City of Alton, cross-appeal the district judge's decision to assess attorneys' fees against them for missing the court's deadline for filing dispositive pretrial motions. These defendants contend that the judge abused his discretion in sanctioning them because, at the time Towse's motion for summary judgment was granted, it was clear that Campbell's suit could not proceed. They therefore maintain that Jones' and the City's motions to dismiss should have been converted to motions for summary judgment pursuant to Fed.R.Civ.P. 12(b).[4] Although we can sympathize with the district judge's point that he was not required to manage the case for Jones and the City, we must agree that as soon as it became apparent that Towse was entitled to

summary judgment on the basis of the court's *Pickering* analysis (rather than on the basis of some ground unique to him), the remaining defendants were as well. See Fed.R.Civ.P. 12(b); *see also Fleischfresser v. Directors of School Dist. 200,* 15 F.3d 680, 684 (7th Cir.1994) (where materials extraneous to pleadings are under consideration, Rule 12(b) compels district court to treat motion to dismiss as one for summary judgment); *Venture Associates Corp. v. Zenith Data Systems Corp.,* 987 F.2d 429, 431 (7th Cir.1993) (Rule 12(b) is mandatory, so that if materials outside pleadings are before district court and not excluded, court must convert 12(b)(6) motion to one for summary judgment). It was therefore inappropriate to require Jones and the City to pay Campbell's attorneys' fees, incurred in preparing for a trial that all parties knew would not take place.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of Towse, Jones, and the City of Alton, and we REVERSE the award of attorneys' fees assessed against Jones and the City of Alton.

---

3. The defendants also argue in a very cursory fashion that (1) a suspension with pay is a *de minimis* punishment which raises no constitutional concerns, and (2) Campbell failed to respond to Towse's argument, originally raised in his motion for summary judgment, that Towse played no role in meting out Campbell's punishment. In light of our conclusions above, we need not reach these alternative grounds for affirming summary judgment. We merely note in reference to the first point that the loss suffered by Campbell in being suspended with pay was sufficient to confer standing upon Campbell to challenge the suspension. *See Brown v. Disci-*

*plinary Comm., Edgerton Volunteer Fire Dept.,* 97 F.3d 969, 972 (7th Cir.1996).

4. Rule 12(b) states in relevant part,

If, on a motion [pursuant to 12(b)(6)] to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such motion by Rule 56.