In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1460

Octavio Delgado,

Plaintiff-Appellee,

v.

Police Chief Arthur Jones and
Deputy Chief Monica Ray,

Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 00 C 917--Lynn Adelman, Judge.

Argued September 5, 2001--Decided March 8, 2002


   Before Cudahy, Rovner, and Diane P. Wood,
Circuit Judges.

   Cudahy, Circuit Judge.  Octavio Delgado
is a detective with the Milwaukee Police
Department who alleges that he was
transferred to a less desirable position
and denied vacation time in retaliation
for an investigation in which he
participated and a memorandum that he
wrote about alleged criminal activities
involving a close relative of an elected
official. This elected official is also
purported to be a close personal friend
of the Chief of Police, Arthur Jones, one
of the defendants. In turn, Deputy Chief
Monica Ray is alleged to have been
involved in the sequence of events
leading to the transfer. The district
court denied the defense of qualified
immunity. Under the Supreme Court's
ruling in Behrens v. Pelletier, 516 U.S.
299, 306 (1996), a denial of a qualified
immunity defense is immediately
appealable under 28 U.S.C. sec. 1291. We
now affirm the decision of the district
court.

I.

   Octavio Delgado is a 15-year veteran of
the Milwaukee Police Department (MPD). In
December of 1997, Delgado began working
in the department's Vice Control Unit.

Thereafter, until his alleged retaliatory transfer on May 18, 2000, Delgado had been receiving satisfactory job evaluations.

In April 2000, or thereabouts, Delgado served as part of a drug entry team that executed a search warrant at a suspected drug house within the City of Milwaukee. This police operation ultimately resulted in the arrest of several persons. In May of 2000, Delgado received a letter from an individual arrested during the execution of the April search warrant. The letter claimed that the arrestee had information about the buying and selling of drugs by public school employees and the patronage of a drug house by a close relative of a public official as well as knowledge of a drug dealer who lived with a state employee. The letter also stated that Chief of Police Jones was a close personal friend of the public official whose immediate relative was alleged to have frequented the drug house. Delgado then showed the letter to his supervising lieutenant, who commented: "What district do you want to be transferred to?" According to the appellee's brief, the intended inference of the supervisor's comment was that investigations of politically sensitive matters often result in unfavorable treatment, including unwanted transfers.

Delgado was subsequently ordered to interview the author of the letter (the former arrestee) in order to corroborate the details of the letter. Delgado was then instructed to write a "Matter of" memorandum summarizing the contents of the interview with the former arrestee and to submit it to his lieutenant.

This memo ultimately moved up the chain of command to Deputy Chief Ray, who recommended that it be investigated by an outside law enforcement agency. It is unclear from the complaint whether Deputy Chief Ray had the authority to make this decision. Nevertheless, on May 18, 2000, Chief Jones was notified of the "Matter of" memorandum. In a meeting with Delgado's captain and Deputy Chief Ray, Chief Jones ordered that the investigation stay within the MPD and instructed Delgado's captain not to discuss the "Matter of" memorandum with Delgado or anyone else.

The following day, Chief Jones issued an

order transferring one person, Delgado, from the Vice Control Division to the Criminal Investigations Bureau, retroactive to the previous day, Thursday, May 18. According to the complaint, this transfer was a departure from normal practice, since most transfers occur on Fridays at the end of a pay period and take effect the following Sunday. Moreover, the unit Delgado was transferred out of already had several vacancies.

From May 18 until May 26 Delgado was on vacation. During this period, the letter writer was allegedly interrogated by other MPD officers on the subject of his earlier interview with Delgado. When Delgado returned to work on the 26th, he was ordered to undergo a urine drug test and was informed that he was under investigation by the MPD's Internal Affairs Division for his communication with the letter writer, allegedly in violation of a departmental rule.

On the same day, Delgado also received a second letter from the same arrestee providing additional information on potential drug dealers. Delgado forwarded this letter to his former lieutenant in the Vice Squad Unit. The following day, Delgado asked both his former lieutenant and a captain in the Vice Squad Unit why he had been transferred, and he was advised that Chief Jones had forbidden any communication by these supervisors with Delgado.

Finally, Delgado claims that in the succeeding weeks and months, his pre-approved vacation schedule was unilaterally truncated or cancelled in accordance with rules that were not being applied to his fellow officers. Again, according to the complaint, Delgado had been receiving good performance evaluations. In addition, the MPD has a rule prohibiting the use of transfers as a form of discipline.

On a motion for a judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c) and 12(h)(2), the district court denied the appellants' request that they be accorded the defense of qualified immunity.

II.

This case presents two issues on appeal: (1) whether both Chief Jones and Deputy Chief Ray are entitled to qualified immunity because, within the specific context of this case, a reasonable official would not have concluded that Detective Delgado had a First Amendment right to free speech; and (2) whether Deputy Chief Ray, who forwarded Detective Delgado's "Matter of" memorandum to Chief Jones, is also entitled to qualified immunity because her role in any alleged retaliation was entirely ancillary and administrative in nature. A motion for a judgment on the pleadings under Fed. R. Civ. P. 12(c), like a motion for failure to state a claim under Fed. R. Civ. P. 12(b)(6), should not be granted "unless it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." Gustafson v. Jones, 117 F.3d 1015, 1017 (7th Cir. 1997) (quoting Frey v. Bank One, 91 F.3d 45, 46 (7th Cir. 1996)). In evaluating the motion, we view the allegations of the complaint in the light most favorable to the nonmoving party. See id. The standard of review in determining the validity of a qualified immunity defense and the underlying interpretation of the First Amendment is de novo, with the courts' accepting all well-pleaded factual allegations as true, and making all permissible inferences in the plaintiff's favor. See id. at 1017-18.

As a threshold matter, the Supreme Court's jurisprudence on qualified immunity requires that this issue be resolved at the earliest stages of litigation. In Harlow v. Fitzgerald, 457 U.S. 800 (1982), the Supreme Court limited the inquiry for qualified immunity to an objective reasonableness standard in order to facilitate judgment as a matter of law and concluded that "[u]ntil this threshold immunity question is resolved, discovery should not be permitted." Id. at 818-19./1 Therefore, in order for a plaintiff to successfully defeat a qualified immunity defense, two conditions must be satisfied: (1) the complaint must adequately allege facts that, if true, would constitute a violation of a constitutional right; (2) the case law must be "clearly established" at the time of the alleged violation, so that a reasonable public official would have know that his conduct was unlawful. Id./2

In Siegert v. Gilley, 500 U.S. 226 (1991), the Court observed that a decision "of this purely legal question permits courts expeditiously to weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in expensive and time-consuming preparation to defend the suit on the merits." Id. at 232. One of the intended effects of the qualified immunity defense is "to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." Id. The policy that underlies this judicially created doctrine is that meritless and insubstantial lawsuits can distract officials from their public duties, inhibit the exercise of independent judgment and discretion and ultimately discourage highly qualified citizens from entering public service. See Harlow, 457 U.S. at 814 (discussing the "social costs" that flow from lawsuits against innocent public officials); see also Donovan v. City of Milwaukee, 17 F.3d 944, 947 (7th Cir. 1994) (observing that "few individuals will enter public service if such service entails the risk of personal liability for one's official decisions").

Here, our review of the district court's denial of the qualified immunity defense must focus on two issues: (1) Did the defendants' alleged conduct amount to a violation of Delgado's First Amendment rights? (2) Was this conduct clearly established as a violation of the Constitution at the time of the alleged violation?

A.

For a First Amendment retaliation claim to survive a judgment on the pleadings, we have held that "the facts alleged in the complaint must show that (1) the speech in which the plaintiffs engaged was constitutionally protected under the circumstances, and (2) the defendants retaliated against them because of it." Gustafson, 117 F.3d at 1018 (citing Caldwell v. City of Elwood, 959 F.2d 670, 672 (7th Cir. 1992)). Moreover, in the context of a qualified immunity defense, "The plaintiff bears the burden of establishing the existence of a clearly established constitutional right."

Donovan, 17 F.3d at 951-52 (citing Radovich v. Wade, 850 F.2d 1180, 1209 (7th Cir. 1988) (en banc)).

The Supreme Court has held that the speech of a government employee warrants First Amendment protection if that speech "addresses a matter of public concern." Connick v. Myers, 461 U.S. 138, 147 (1982)./3 Whether the employee's speech falls under the rubric of public concern must be determined "by the content, form, and context of a given statement, as revealed by the record as a whole." Id. at 147-48. Of these three factors, this court has determined that the content of the speech is the most important. See Campbell v. Towse, 99 F.3d 820, 827 (7th Cir. 1996); Glass v. Dachel, 2 F.3d 733, 740 (7th Cir. 1993).

The Supreme Court's First Amendment jurisprudence also requires that a court, in determining the nature of a public employee's speech, seek "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of public service." Connick, 461 U.S. at 142 (quoting Pickering v. Board of Education, 391 U.S. 563, 568 (1968)). However, this inquiry, which is commonly know as the Pickering balancing test, can seldom be done on the basis of the pleadings alone. See Gustafson, 117 F.3d at 1019 (noting that "it would be a rare case indeed where the pleadings as a whole would permit judgment as a matter of law on this point, unless the plaintiff was relying on speech that is wholly unprotected by the First Amendment or the defendant's justifications were frivolous"); Jefferson v. Ambroz, 90 F.3d 1291, 1296-97 (7th Cir. 1996) (ruling for the defendant because the plaintiff included in his complaint facts that established that the defendant would prevail under the Pickering balancing test). In most cases, application of the Pickering balancing test will be possible only after the parties have had an opportunity to conduct discovery. Gustafson, 117 F.3d at 1019. However, even at an early stage of litigation, a First Amendment retaliation claim can sometimes be resolved on the public concern test on the basis of the three Connick factors of content, form and context of the disputed speech.

In terms of content, this court has determined that police protection and public safety are generally a matter of public concern. See Auriemma v. Rice, 910 F.2d 1449, 1460 (7th Cir. 1990) (en banc) ("It would be difficult to find a matter of greater public concern in a large metropolitan area than police protection and public safety."); Glass, 2 F.3d at 741 ("Obviously, speech that focuses on police departments (and ultimately police protection and public safety) involve matters of great public concern."). Here, Delgado's complaint alleges that a former arrestee sent him a letter that contains information about criminal drug activity. The letter alleges that a close relative of an elected official had been frequenting a drug house, and that Chief Jones was a close personal friend of this elected official. A subsequent interview with the arrestee corroborated the claims of the letter. All of this information was contained in the "Matter of" memorandum. For this reason, Delgado's captain provided a copy of this memorandum to Deputy Chief Ray with a recommendation that an investigation be conducted by an outside law enforcement agency.

Thereafter, Delgado has alleged specific instances of retaliation, including an unsolicited job transfer and restrictions on his enjoyment of vacation that occurred immediately after the Chief received the "Matter of" memorandum. Moreover, Chief Jones decided to ignore the recommendation that an outside agency conduct the investigation; he ordered Delgado's supervisors not to discuss Delgado's memorandum with anyone. In addition, the supervisors were allegedly ordered not to discuss the transfer decision with Delgado.

Certainly, a communication by a law enforcement officer that contains information essential to a complete and objective investigation of serious criminal activity is "content" that implicates public concern. Moreover, the Connick factors of form and context, which can be clarified by an examination of an employee's motivation, also support Delgado's claim. In Linnhart v. Glatfelter, 771 F.2d 1004 (7th Cir. 1985), an acting police chief of a municipality claimed that his various

behind-the-scene activities, which were designed to secure him the chief's position on a permanent basis, were protected speech under the First Amendment. In rejecting the plaintiff's claim, we stated that an inquiry under Connick "requires us to look to the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or was the point to further some purely private interest?" Id. at 1010 (emphasis in original). In Linnhart, the plaintiff had engaged in conversationsdesigned to persuade his principal rival to apply for a different position within the municipal government. We determined that the political or social content of the acting chief's speech was not sufficient to overcome the obvious self-interested context in which these conversations occurred.

As in Linnhart, the inquiry into motivation relates to both the form and the context of Delgado's speech. Here, there are absolutely no facts in the pleadings suggesting that Delgado's communications, both in conversations with his supervisors and in his "Matter of" memorandum, would somehow benefit him personally. Quite to the contrary, after informing his lieutenant of the content of the arrestee's letter, Delgado was asked, "What district do you want to be transferred to?" Drawing all inferences in favor of Delgado, as we must at this stage of the litigation, this comment could certainly support the inference that employees who bring to light politically sensitive or embarrassing allegations about their superiors are often subject to unwanted job transfers. Although the manner in which Delgado per formed his police work was apparently designed to bring on an appropriate investigation (and thus suggests a matter of public concern), there is no suggestion that Delgado also furthered some personal, private interest. Also, the fact that Delgado communicated privately with his superiors does not make his speech less a matter of public concern. Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 415-16 (1979) ("Neither the [First] Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public.").

In arguing that Delgado's actions did not involve a matter of public concern, the defendants rely on Gonzalez v. City of Chicago, 239 F.3d 939 (7th Cir. 2001), for the proposition that communications that are part of an employee's regular job duties are not matters of public concern. In Gonzalez, a newly recruited police officer, who formerly served as a civilian employee of the Chicago Police Department's Office of Professional Standards, was discharged shortly after completing his police academy training. Gonzalez claimed that poor job evaluations he had received were based on false information that was furnished to retaliate against him for several negative reports he had authored about police officers who were now his co-workers. In finding that Gonzalez's earlier work activities did not constitute protected speech under the First Amendment, this Court emphasized that Gonzalez was "clearly acting entirely in an employment capacity when he made those reports," id. at 941 (emphasis added), and that he "could have been fired had he not produced the reports," id. at 942 (emphasis added).

The defendants argue that under Milwaukee Ordinances 105-125 and 105-126, Delgado was duty-bound to report all violations of city ordinances to the Chief of Police and to arrest all persons found to have violated any law or ordinance. This argument, however, sweeps much too broadly. On the facts of this complaint, Delgado had information about criminal activity that potentially involved an immediate relative of an elected official, who also happened to be a close personal friend of Chief Jones. Fully divulging this information to his superiors may have been consistent with his obligations as a police officer in seeking an independent and objective investigation. And it was hardly in his personal interest to antagonize the Chief. See Linnhart, 771 F.2d at 1010. But we think Delgado had considerable discretion about how he communicated the information up the chain of command. His disclosure went far beyond some rote, routine discharge of an assigned duty, as in Gonzalez. Our holding in Gonzalez is limited to routine discharge of assigned functions, where there is no suggestion of public motivation. In the case now

before the court, Delgado's communications with his superiors were designed not only to convey information of possible crimes, but also additional facts that were relevant to the manner and scope of any subsequent investigation. Effective police work would be hopelessly compromised if police officers could be retaliated against for communicating factual details (e.g., a supervisor's relationship to a criminal suspect) that bear on the department's ability to conduct an objective investigation. The fact that a police officer's job responsibilities may in some measure overlap with motivations of a well-meaning citizen does not change this analysis.

In contrast, Gonzalez addresses a different scenario where the effective discharge of a public employee's routine duties touches on a matter of public concern--arguably a very broad category. In order to prevent every adverse employment decision from claiming the shield of First Amendment protection, Gonzalez requires some type of speech or expression that, in addition to objectively promoting or protecting a matter of public concern, is also a product of some independent discretion or judgment. 239 F.3d at 941 (noting that Gonzalez would have stated a claim had his employers asked him to rewrite his reports so as not to expose police corruption and he nevertheless undertook efforts to accurately communicate his findings). But the dichotomy between routine and discretionary functions is not quite the same as the distinction between public or private motive discussed in Linnhart. The latter distinction has broader application.

We must weigh the interests of the public employee in speaking upon matters of public concern against the State's interest in furthering efficient public service, as required under the Pickering balancing test. Gonzalez essentially represents a categorical judgment for the employer insofar as a public agency cannot efficiently carry out its functions if the faithful discharge of routine tasks could become grounds for challenging virtually any personnel decision. See Connick, 461 U.S. at 149 ("To presume that all matters which transpire within a government office are

of public concern would mean that virtually every remark . . . would plant the seed of a constitutional case."). Gonzalez clarified that "we are not 'establishing a per se rule exempting statements made in the course of official duties from the protection of the First Amendment.'" 239 F.3d at 942 (quoting Koch v. City of Hutchinson, 847 F.2d 1436 (10th Cir. 1988)). The broad sweep of the defendants' argument is essentially calling for such a per se rule, which this court rejected in Gonzalez.

Delgado has alleged sufficient facts to establish that his speech is constitutionally protected and that the defendants retaliated against him because of it. Therefore, his complaint states a valid First Amendment retaliation claim.

B.

After establishing that the plaintiff has adequately alleged a violation of a constitutional right, the second level of inquiry in a qualified immunity analysis involves whether the law was "clearly established" at the time of the alleged violation. Here, the defendants have no valid argument. In Gustafson, this court observed, "It has been well established for many years in this Circuit that a public employer may not retaliate against an employee who exercises his First Amendment speech rights, including in particular retaliation through a transfer to a less desirable position." 117 F.3d at 1020./4 Although the defendants argue that Gonzalez somehow altered the First Amendment landscape in this Circuit, the alleged retaliation against Delgado occurred about eight months before our decision in Gonzalez, eliminating any possibility of reliance.

The defendants' only response to this argument is that the Eleventh Circuit had issued an opinion in Morris v. Crow, 142 F.3d 1379 (11th Cir. 1998), which seems to have announced a rule similar to Gonzalez. In Morris, an officer in the Polk County Sheriff's Office in Florida filed an accident report on a high speed collision that involved a fellow officer. In a lawsuit that followed, Morris gave deposition testimony about the accident that was damaging to his employer. After several months, the lawsuit was settled

and Morris was then suspended and fired. The Eleventh Circuit concluded that Morris' report "was generated in the normal course of his duties as an accident investigator. The report discussed only his investigation and reconstruction of a single accident." Id. at 1382. The subsequent deposition in a civil lawsuit also was determined to have no constitutional import. Id. at 1383.

However, as in Gonzalez, the Eleventh Circuit in Morris also expressed concern that routine public duties should not be elevated to a protected status under the First Amendment, lest every remark by a government employee "plant the seed of a constitutional case." 142 F.2d at 1382 (quoting Connick, 461 U.S. at 149). Although concerns of efficiency may require a safe harbor for personnel decisions that are made against the backdrop of an employee's routine job duties, this category is narrow and cannot be permitted to swallow the First Amendment. No doubt government efficiency can be equally compromised if government supervisors can freely pursue retaliation for speech that is politically sensitive or embarrassing.

In the case now before the court, Delgado was singled out by the former arrestee and given information on alleged criminal activity. Once this information was reduced to the "Matter of" memorandum, it was forwarded by Delgado's captain to Deputy Chief Ray with a recommendation that any subsequent investigation be performed by an outside law enforcement agency. Such a situation is certainly not routine. Moreover, because the subject of Delgado's communication was highly relevant to an independent and objective investigation of criminal activity and was not motivated by the personal interests of Delgado--in short, it was a matter of public concern--a public official knowledgeable about relevant case law could not have reasonably believed that he was free to retaliate by ordering an unwanted transfer to a less desirable job or by the manipulation of Delgado's vacation schedule.

III.

Since Chief Jones allegedly ordered the unwanted job transfer and the change in

Delgado's vacation schedule, the defense of qualified immunity must fail as applied to him. Deputy Chief Ray, however, asserts that she is entitled to qualified immunity because her only role in this alleged sequence of events was to forward the "Matter of" memorandum to Chief Jones.

A judgment on the pleading, like a motion to dismiss, should not be granted "unless 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" Cushing v. City of Chicago, 3 F.3d 1156, 1159 (7th Cir. 1993) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)); see also Gustafson, 117 F.3d at 1017 (stating that in response to a motion under Rule 12(c), a court should not dismiss a claim "unless it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief"). At this early stage in the litigation, we have insufficient facts to conclude that Deputy Chief Ray played no part in any retaliation against Delgado. Therefore, the defense of qualified immunity must also fail with respect to Deputy Chief Ray.

We AFFIRM the decision of the district court and remand for further proceedings on the First Amendment retaliation claim.

FOOTNOTES
/1 A qualified immunity analysis can be conducted on the facts alleged in the plaintiff's complaint, though many qualified immunity determinations are made in the context of summary judgment, where materials outside the pleadings may be considered. Obviously, discovery may occur if a defendant does not raise the qualified immunity defense.

/2 The Harlow court also noted that in extraordinary circumstances, a defense of qualified immunity can be sustained if the official "can prove that he neither knew nor should have known of the relevant legal standard. . . . But again, the defense would turn primarily on objective factors." 457 U.S. at 819. This nuance has no application here.

/3 The Supreme Court in Connick suggested the possibility that speech might also be protected under the First Amendment "even if not touching upon a matter of public concern." 461 U.S. at 147. However, the Court failed to specifically articulate what type of speech would fall into

such a category. Similarly, this court restricts its analysis to the issue of what constitutes a public concern.

/4 Under Harlow, a court determines whether the law was "clearly established" at the time of the alleged violation; thereafter, an official's conduct can be measured against a standard of "objective reasonableness." 457 U.S. at 818. "If the law was clearly established, the immunity defense should fail, since a reasonably competent official should know the law governing his conduct." Id. at 818-19. Although this fact has no legal significance under the objective standard prescribed by Harlow, it is at a minimum ironic that Chief Jones was a defendant in Gustafson, a precedent which further settled the law in this Circuit on First Amendment retaliation claims.