# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-3396

GEORGE C. SCHAD,

Plaintiff-Appellee,

v.

ARTHUR L. JONES, Police Chief,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 02 C 544—**J.P. Stadtmueller**, *Judge.*

_____

ARGUED MAY 3, 2005—DECIDED JULY 15, 2005

_____

Before FLAUM, *Chief Judge,* and KANNE and SYKES, *Circuit Judges.*

FLAUM, *Chief Judge.* Plaintiff-appellee George C. Schad, a police officer with the Milwaukee Police Department ("MPD"), filed suit pursuant to 42 U.S.C. § 1983, alleging that the City of Milwaukee, Wisconsin, and Arthur L. Jones, former Chief of Police for Milwaukee, violated the First Amendment to the United States Constitution by transferring Schad in retaliation for his statements to a fellow officer. The district court denied defendants' motion for summary judgment, holding that Schad's speech was

constitutionally protected and that Chief Jones was not entitled to qualified immunity. Chief Jones appeals and, for the reasons stated herein, we reverse.

## I. Background

From November 1999 through February 2001, Officer Schad served as a member of the Warrant Squad of the MPD. The Warrant Squad, which is responsible for locating and arresting people wanted on outstanding warrants, is a desirable assignment within the MPD for which officers are specially selected.

In late January or early February 2001, the MPD's Tactical Enforcement Unit was in a 24-hour standoff with a suspect named Lesmes Rivera. Members of the Unit succeeded in arresting Rivera only after using teargas to draw him out of the house in which he had barricaded himself. On February 14, 2001, Rivera posted bail and was released.[1] The same day, Chief Jones transmitted Rivera's name to all MPD district stationhouses, stating that Rivera was wanted on three felony warrants.

At the February 14, 2001 Warrant Squad roll call, Schad and the other squad members on duty were instructed to locate and arrest Rivera. They were given Rivera's photograph and possible addresses where he might be found. Following roll call, the acting Criminal Investigation Bureau shift commander, Lieutenant William Jessup, called Schad and told him that he had received an anonymous tip about Rivera's location. When Lieutenant Jessup asked him to check the address located in Milwaukee's district no. 2, Schad responded that neither he, nor any of the other Warrant Squad officers on duty, were available to follow up

---

[1] It is not clear from the record whether Rivera was released in error.

on the tip at that time. The call ended with Lieutenant Jessup saying "we have to get somebody out there," or something to that effect.

Following Lieutenant Jessup's call, another Warrant Squad officer suggested that Schad call Officer Matthew Knight who was assigned to district no. 2 and who was familiar with the Rivera case. Rather than relaying this suggestion to Lieutenant Jessup, Schad called Knight directly. Knight agreed to follow up on the tip and, after receiving permission from his sergeant, went with his partner to the address provided by Schad. Upon entering the building at that address, Knight found Rivera in the hallway and told him that he was under arrest. When Rivera reached for a pistol in his waistband, Knight knocked it away and a "major struggle" ensued. Rivera eventually was subdued and taken into custody.

Soon after Rivera's arrest, Schad learned that Chief Jones was angry that he had disclosed the Rivera tip to Knight. The earlier standoff with Rivera made Chief Jones concerned about officer safety and he wanted the specially trained Tactical Enforcement Unit to make the arrest. Lieutenant Jessup had in fact contacted the Tactical Enforcement Unit after his call to Schad, but Knight and his partner arrested Rivera before officers from the Unit could arrive on the scene. Schad later heard rumors that the real reason Chief Jones had wanted the Tactical Enforcement Unit to make the arrest was that he hoped it would make up for the Unit's earlier standoff with Rivera that had made the chief look bad.

Two days after Rivera's arrest, Chief Jones transferred Schad from the Warrant Squad to patrol duty, a much less desirable assignment. Chief Jones stated that he transferred Schad because he had breached the MPD's confidentiality rule by disclosing Rivera's whereabouts to someone outside of the Warrant Squad. He said that he believed that

Schad "placed officers' lives in danger by releasing information to those officers [to whom] he was not authorized to release [it]."

On June 4, 2002, Schad filed a First Amendment retaliation suit in federal court against Chief Jones and the City of Milwaukee. Defendants moved for summary judgment, arguing that Schad's speech was not protected by the First Amendment because it was not on a matter of public concern, and asserting Chief Jones's entitlement to qualified immunity. The district court held that Schad's speech was protected and denied Chief Jones's claim of qualified immunity.

## II. Discussion

Although the denial of summary judgment did not end this case in the district court, we have jurisdiction to review whether the district court properly denied defendant-appellant Jones's claim of qualified immunity. *See Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 352 (7th Cir. 2005); *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) ("[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment."). Where a defendant has asserted entitlement to qualified immunity, we review de novo a district court's denial of summary judgment. *Leaf v. Shelnutt*, 400 F.3d 1070, 1077 (7th Cir. 2005). Summary judgment is appropriate if the evidence presented by the parties "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Government officials enjoy qualified immunity and are shielded from civil liability, "as long as their actions could reasonably have been thought consistent with the rights

they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). To determine whether an official is entitled to qualified immunity, we ask: (1) whether the facts alleged, taken in the light most favorable to the party asserting the injury, demonstrate that the official's conduct violated a constitutional right; and (2) whether the right was "clearly established" such that it would have been clear to a reasonable official "that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). We need not address the second question in this case because, for the reasons explained below, we answer the first in the negative. *See id.* at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

Schad contends that Chief Jones violated his First Amendment right to freedom of speech by retaliating against him for disclosing the Rivera tip to Knight. "A government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment." *City of San Diego v. Roe*, 125 S. Ct. 521, 523 (2004). Because "the government as an employer has an interest in conducting its operations as effectively as possible," however, "public employees do not have an unfettered right to express themselves on matters related to their jobs, and courts must give due weight to the government's interest in efficient employment decisionmaking when evaluating retaliation claims." *Brooks v. Univ. of Wis. Bd. of Regents*, 406 F.3d 476, 479 (7th Cir. 2005) (citing *Cygan v. Wis. Dep't of Corr.*, 388 F.3d 1092, 1098 (7th Cir. 2004); *Waters v. Churchill*, 511 U.S. 661, 675 (1994)). To establish a claim of First Amendment retaliation, a plaintiff must prove "that the speech in question is constitutionally protected and that it was a substantial, or motivating, factor in the employer's retaliatory actions." *Brooks*, 406 F.3d at 479. "If the plaintiff establishes these elements, the

burden shifts to the government to prove that it would have taken the same action in the absence of the protected speech." *Id.* In this case, there is no dispute that Chief Jones transferred Schad to a less desirable assignment because he disclosed the Rivera tip to Knight, and that the transfer would not have occurred had Schad not done so. Therefore, the only issue before us is whether Schad's speech was constitutionally protected.

In determining whether a government employee's speech is constitutionally protected, we apply the two-step *Connick-Pickering* test. *Cygan*, 388 F.3d at 1099 (citing *Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563 (1968)). First, under *Connick*, we must determine whether the employee spoke "as a citizen upon matters of public concern." *Connick*, 461 U.S. at 147; *see also Cygan*, 388 F.3d at 1099. In making this determination, we examine "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. Second, under *Pickering*, we balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568; *see also Cygan*, 388 F.3d at 1099. The parties, as well as the district court, addressed only the *Connick* part of the test, and so shall we. *See Spiegla v. Hull*, 371 F.3d 928, 940 (7th Cir. 2004) (appellate court will not apply the *Pickering* balancing test where arguments on the application of the test were not presented in the defendant's motion for summary judgment and the district court was silent on the issue).

We begin our inquiry into whether Schad spoke as a citizen on a matter of public concern by examining the content of his speech. "Speech by a government employee relating to ordinary matters of internal operation and lacking connection to 'any matter of political, social, or other concern to

the community' is not entitled to First Amendment protection." *Spiegla*, 371 F.3d at 936 (quoting *Connick*, 461 U.S. at 146). The speech at issue here consists only of Schad's telephone call to Knight in which he disclosed the anonymous tip about Rivera's location. Although "police protection and public safety are generally a matter of public concern," *Delgado v. Jones*, 282 F.3d 511, 517 (7th Cir. 2002), not all speech by police department employees is "upon matters of public concern" under the *Connick* analysis. *See, e.g., Gonzalez v. City of Chicago*, 239 F.3d 939 (7th Cir. 2001) (reports regarding instances of police misconduct written by a police department employee were not upon matters of public concern). As we observed in *Kuchenreuther v. City of Milwaukee*:

> While speech addressing matters of police protection and public safety are matters of public concern, we have cautioned that if every facet of internal operations within a governmental agency were of public concern, and therefore any employee complaint or comment upon such matters constitutionally protected, no escape from judicial oversight of every government activity down to the smallest minutia would be possible.

221 F.3d 967, 974 (7th Cir. 2000) (internal quotations and citations omitted). Rather than relying on the fact that Schad's speech concerned the general topic of law enforcement, we must "delve deeper into the precise content" to determine whether what was said on this topic was of public concern. *Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999).

In *Connick*, the Supreme Court considered a retaliation claim by assistant district attorney Sheila Myers, whose employment was terminated after she circulated a questionnaire to coworkers asking about their confidence and trust in various supervisors, the level of office morale, and the need for a grievance committee. 461 U.S. at 140-42. Myers

had distributed the questionnaire after learning that she was slated for an unwanted transfer, and the Court determined that her questions were "mere extensions of Myers' dispute over her transfer." *Id.* at 148. The Court went on to explain why the content of her speech was not of public concern even though the general topic of employee satisfaction in a prosecutor's office might be of interest to the community:

> Myers did not seek to inform the public that the District Attorney's office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did Myers seek to bring to light actual or potential wrongdoing or breach of public trust on the part of [the District Attorney] and others. . . . While discipline and morale in the workplace are related to an agency's efficient performance of its duties, the focus of Myers' questions is not to evaluate the performance of the office but rather to gather ammunition for another round of controversy with her superiors.

*Id.*

Based on this guidance, "our cases have consistently held that speech alleging government corruption and malfeasance is of public concern in its substance." *Spiegla*, 371 F.3d at 937 (collecting cases). For instance, correctional officer Nancy Spiegla was transferred after she questioned a new vehicle search policy and reported the suspicious conduct of two of her superiors who appeared to be using that policy to facilitate unlawful behavior. *Id.* at 936. Although the content of Spiegla's speech was "comfortably on the socially valuable side of the constitutional line," we explained that the case might have been different had Spiegla merely questioned the policy pursuant to which the officials were acting and had not disclosed the officials' suspicious conduct. *Id.* at 937. We emphasized that "[t]here

must be a communicative element to speech that puts the listener on alert that a matter of public concern is being raised," and that "the specificity and seriousness of the allegations against [Spiegla's superiors]" were essential to our conclusion that her speech was protected. *Id.* at 937, 939.

In this case, the content of Schad's speech was the tip about Rivera's possible location, the type of information typically transmitted between officers in a police department. As in *Connick*, Schad did not seek to inform the public that the police department was not discharging its governmental responsibilities in the arrest of wanted individuals. He did not bring to light actual or potential wrongdoing, nor did he set out to remedy the flawed functioning of the department by reporting needed changes to a superior. Nothing in Schad's speech could have alerted Knight, or anyone else, that a matter of public concern was being raised.

Although the public is generally concerned with the safe arrest of dangerous suspects, the focus of Schad's call to Knight was not the evaluation of the MPD's performance in accomplishing this task. Rather, he agreed with Chief Jones about the importance of arresting Rivera and disclosed the tip to Knight in an effort to accomplish this goal. That Schad chose a course different from the one preferred by Chief Jones is of no consequence because, unlike Spielga, Schad did not follow his standard transmission of information with a civic-minded critique of Chief Jones's strategy for arresting Rivera or report that the chief was not acting with the best interest of the community in mind. Schad let the matter rest after his routine call to Knight, suggesting that his speech was an ordinary part of the internal operation of the police department, and indicating that he did not speak as a citizen addressing a matter of public concern.

The form of Schad's speech supports the same conclusion. Although we have held that speech need not be addressed to the general public to be protected, *see Delgado*, 282 F.3d at 518, choosing a form of speech routinely used for intra-office communications may suggest that the employee did not set out to speak as a citizen. In *Gonzalez v. City of Chicago*, we considered the discharge of Gerardo Gonzalez, a newly recruited police officer who formerly served as a civilian employee of the Chicago Police Department's Office of Professional Standards investigating and writing reports on police misconduct. 239 F.3d at 940. Gonzalez alleged that he received poor job evaluations in retaliation for several negative reports he had written about police officers who later became his coworkers. In concluding that Gonzalez's earlier work activities did not constitute protected speech, we emphasized that he had written the reports "merely as an employee." *Id.* at 941. "The form of his speech (routine official reports)," we concluded, "indicate[d] that Gonzalez did not speak 'as a citizen' on a matter of public concern." *Id.* Similarly, Schad made an informal telephone call to provide another officer with information typically shared between officers. The form of Schad's speech does not distinguish it from everyday employment-related communications or indicate that Schad was speaking as a citizen rather than as an employee.

Finally, we turn to the context of the speech, considering Schad's motive for speaking and the circumstances in which he spoke. *See Spiegla*, 371 F.3d at 938. In *Gonzalez*, the fact that the employee's reports were written "pursuant to duties of the job" indicated to us that he had not spoken as a citizen. 239 F.3d at 941. In this case, Schad called Knight in the context of the MPD's efforts to locate and arrest Rivera. Schad admits that he was "doing his job," and that his speech "was meant to complete the Warrant Squad's main mission for that shift which was to arrest Rivera." Nevertheless, he emphasizes that "there is no indication

that he was discharging an assigned duty." The district court also relied on the fact that Lieutenant Jessup did not expressly assign to Schad the task of calling Knight, and that it took some initiative on Schad's part to call Knight directly.

This distinction has no significance in the context of this case. A police officer's job entails the use of judgment and discretion in performing his or her duties. Demonstrating initiative in carrying out one's responsibilities does not transform ordinary employment speech into speech on a matter of public concern. Gonzalez used discretion in completing his reports on police misconduct, but the reports were not protected because he wrote them "merely as an employee." *Gonzalez*, 239 F.3d at 941. Like Gonzalez, Schad acted entirely in his employment capacity. Whether Chief Jones was more concerned about officer safety or his own image, the result is the same. There is no evidence that Schad's motivation for calling Knight was anything other than that of an officer engaged in the performance of his everyday duties, and no evidence that the circumstances in which Schad spoke differed in any way from the ordinary internal operations of the police department. Thus, like its content and form, the context of Schad's speech indicates that it was not that of a citizen addressing a matter of public concern.

Furthermore, Schad and Chief Jones both wanted the safe arrest of Rivera and disagreed, if at all, only as to how this goal should be accomplished. Schad's speech, however, did not concern this disagreement. He did not comment on the merits of his decision to call Knight directly, nor did he suggest that the chief was wrong to prefer that the Tactical Enforcement Unit make the arrest. Rather, Schad merely made a judgment call in the course of his work, something police officers do daily. Schad's position, followed to its logical conclusion, would require us to find that almost everything said in the course of police work is constitution-

ally protected and that a chief of police can never treat adversely an officer he believes used poor judgment. The Constitution does not require this result and it is not the province of federal courts to interfere with a police chief's everyday tactical decisions in this way. *Cf. Kuchenreuther*, 221 F.3d at 974-75.

In reaching the opposite conclusion, the district court's relied on *Delgado v. Jones*, 282 F.3d 511 (7th Cir. 2002). There, we considered a report by police officer Octavio Delgado, in which he stated that there was evidence that a relative of a public official frequented a drug house and that the chief of police was a close personal friend of that public official. *Delgado*, 282 F.3d at 513-15. Delgado sued for First Amendment retaliation when the chief of police transferred him to a less desirable assignment in retaliation for his report. *Id.* at 515. We distinguished the case from *Gonzalez*, noting that while Delgado's job required that he report information about suspected crimes, he went further by including in his report "*additional facts*" that called into question "the department's ability to conduct an objective investigation." *Id.* at 519 (emphasis in original). Unlike Gonzalez, Delgado went beyond his normal job responsibilities by acting as a concerned citizen in disclosing information relevant to whether the police chief could perform his job effectively under the circumstances. Schad, by contrast, added nothing to the information that he passed along to Officer Knight as a matter of course. He merely carried out, without comment, a typical aspect of his job as a police officer. The district court's reliance on *Delgado* was misplaced.

### III. Conclusion

The content, form, and context of Schad's speech indicate that he did not speak as a citizen on a matter of public

concern. We hold, therefore, that the speech was not constitutionally protected and that Jones did not violate Schad's First Amendment rights. Accordingly, we REVERSE the district court's order denying defendants' motion for summary judgment and REMAND for proceedings consistent with this opinion.


A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*