# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-1932

JAMES E. MILLER, JR.,

*Plaintiff-Appellee,*

*v.*

ARTHUR L. JONES, Police Chief,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03 C 987—**Thomas J. Curran**, *Judge.*

ARGUED DECEMBER 8, 2005—DECIDED APRIL 17, 2006

Before BAUER, POSNER, and KANNE, *Circuit Judges.*

BAUER, *Circuit Judge.* Former Milwaukee Police Department officer James E. Miller, Jr., claims that he was transferred to a less desirable position because of his speech in opposition to actions taken by then Chief of Police Arthur L. Jones. Miller brought this civil rights action against Jones and the City, pursuant to 42 U.S.C. § 1983, seeking relief in the form of a declaratory judgment and compensatory and punitive damages. At the close of discovery, defendants moved for summary judgment on the ground that no material facts were in dispute and that they were entitled to judgment as a matter of law. The district court denied this motion, but dismissed any claim made against Jones in his official capacity only. Jones appeals the district

court's refusal to grant him qualified immunity arguing that Miller's speech was not protected because it did not address a matter of public concern. For the following reasons, we affirm.

## I. BACKGROUND

The facts of this case are not in dispute, and due to the limited nature of the appeal we focus on the events surrounding the plaintiff's speech. James Miller is a former officer with the Milwaukee Police Department (MPD) who was transferred from the Community Services Division (CSD) to patrol duty on May 27, 2003. Miller was assigned to the Community Services Division in 1992 and spent eleven years working with the Police Athletic League (PAL). PAL provides educational and recreational activities for young people between the ages of five and eighteen. These activities are staffed by Milwaukee police officers, such as Miller, who provide their services free of charge. Other than this in-kind labor, PAL receives no funding from the Police Department and is organized as a non-profit corporation under Wisconsin state law. The MPD benefits from the opportunity to interact with community youths in an indirect law enforcement capacity. PAL's Board of Directors is staffed by both private citizens and members of the MPD, including the Chief of Police.

While working with PAL, Miller served in a number of different roles. Following a formal selection process in 1992, he was chosen by the Board to serve as the Executive Director. The Executive Director is the chief operating officer of the organization and, subject to the control of the Board, is responsible for supervising, controlling, and directing the programming, workforce, and finances. By 1997, Miller also assumed the duties of Treasurer. In both positions, he was responsible for reporting to the Board on areas under his control.

Due to scheduling difficulties with MPD facilities, PAL decided to construct their own athletic center sometime in 1997. Between 1997 and 2002, PAL raised funds, established a building committee, and developed plans with architects and builders. Miller oversaw each step of development and was, effectively, the project manager.

In early March 2002, the future use of the facility came into question. Through his chain of command, Miller received instructions from Chief Jones to give a tour of the PAL facility to the executive board of the Milwaukee area Boys and Girls Club. While giving the tour, Miller learned that Chief Jones had been discussing a possible facilities merger between PAL and the Boys and Girls Club. When Miller responded that this was the first he had heard of the issue, he was told that ". . . if the Chief wants it, he gets it." Tr. Rec. R.50, Dep. Ex. 24, p.3. Within days of the tour, Miller learned that a local Boys and Girls Club was closing, and that it was considering the PAL facility as its new home. On March 21, Jeff Snell of the Boys and Girls Club of Greater Milwaukee wrote to Chief Jones outlining the next steps to be taken in the merger.

On March 22, 2002, PAL Chairman Harris informed the Board of the proposed merger. He also informed them that the Boys and Girls Club was willing to pay for the costs of the facility's staffing and operation, but had not addressed the outstanding expense of the building itself. At that meeting, Captain Haynes, Miller's commanding officer in the CSD, and Miller provided Chairman Harris with a copy of the letter from Snell.

Miller worked with Chairman Harris and other members of the Board to review and respond to the proposed merger. After reviewing PAL's national bylaws, Miller and Captain Haynes concluded that the proposal was contrary to the organization's mission. Miller openly opposed the merger, reasoning that if the Boys and Girls Club operated

the facility there would be no role for MPD officer interaction with the community, thus defeating the purpose of PAL and the MPD's policing benefit. Furthermore, he was concerned that the Club offered no money to help cover the facility's construction debt and that any violation of PAL's national bylaws excluded the chapter from receiving funding from the parent organization.

Chairman Harris wrote to Chief Jones, informing him that no single member of the Board could unilaterally bind the organization, and that the proposed merger likely violated PAL national bylaws. Chief Jones was not pleased with Harris's letter. Shortly after they traded correspondence, Chairman Harris and Director Zigman met with Chief Jones in person and told him that they and Miller opposed the merger.

On March 25 and 26, 2002, Chief Jones confronted his staff regarding the PAL Board opposition to the merger. He yelled at Captain Haynes for passing Snell's letter on to Chairman Harris and told both of them that he put them on the PAL Board and could transfer them off just as easily. Chief Jones then called a meeting with every officer on the PAL Board to discuss the matter. During the meeting he publicly reprimanded Haynes and Miller. Two days later, Haynes was transferred to a position in the Criminal Investigation Bureau; she had no prior experience with the group.

Chief Jones attended the next three straight PAL Board meetings, a first in his tenure with the organization. At the April 9, meeting, Jones was described as being angry with Chairman Harris's letter and publicly doubted that PAL had the capacity to manage the new facility. On April 19, Jones informed the Board that he would not allocate MPD officers to staff the new facility and instructed them to write the Boys and Girls Club to request a plan for merger. He also told the Board that Miller would be demoted from

Executive Director. He explained that having an MPD employee in charge of PAL's finances and employment decisions was an unwanted liability for the City. Members of the Board testified that this reversal came as a surprise given that Miller had been in charge of PAL's management and finances for nearly eleven years and he had overseen the new facility's construction. At the third meeting, on May 3, PAL acquiesced to Jones's demands and created a committee to explore the merger.

By May 24, it was clear that the Boys and Girls Club merger would not satisfy the entire PAL Board. Financially, the Club's proposal did not contribute to the costs of the building debt. Furthermore, other members of the Board greatly valued Miller's opinion, given his involvement with the project, and agreed that the merger would effectively end PAL. That day, Miller and Director Zigman voted against any continued dialogue with the Club. During subsequent meetings in the summer of 2002, the Board turned to Miller for advice, and he continued to oppose the merger.

On July 8, Chief Jones implicitly threatened Miller. At Jones's direction, Deputy Chief Schunk reminded Miller that the Chief was responsible for setting MPD policy and how MPD officers interacted with PAL. Jones also reassigned numerous MPD officers that worked with PAL to the Police Training Academy, effectively cutting them off from serving or communicating with the program. On August 30, Miller was notified by the MPD Internal Affairs Division that he was being investigated for "[f]ailing to treat as confidential the business of the department[; s]peaking on behalf of the department without authorization from the Chief . . . [i]n reference to a conversation you allegedly had with Bob Harris concerning the PAL program." Tr. Rec. 50, Dep. Ex. 7.

On September 27, 2002, Chief Jones informed the Board that Miller was to be removed as Executive Director, and

demoted to Program Director. At the October 25 meeting, Jones reemphasized his demand and told the Board that no MPD officers would work with PAL until Miller's job was redefined. This withholding of services effectively brought PAL's operations to a halt. Some of the Board members testified that they believed the demotion was in retaliation for Miller's opposition to the merger.

On November 4, the Board and Chief Jones were able to agree on a job description for Miller's new position. Following this agreement, Jones wrote to Chairman Harris on November 15 and informed him that while Miller would fulfill his new duties, he would be unable to do anything beyond these requirements. This secondary limitation meant that Miller could no longer serve as a voting member of the Board.

On January 6, 2003, Miller filed a citizen complaint against Chief Jones with the City of Milwaukee Fire and Police Commission, a civilian oversight body. In the complaint, Miller alleged that Chief Jones, *inter alia*, coerced the PAL Board, engaged in retaliatory acts, and unlawfully interfered with the private business of another. Miller's complaint included the relevant Milwaukee Police Department Rule and Regulation for each alleged violation. Tr. Rec. 50, Dep. Ex. 24. Shortly thereafter, Miller also raised questions about certain financial transactions implicating PAL's attorney, their construction contractor, and State Senator George. Miller brought these matters to the attention of Chairman Harris, who then raised them with the Board.

In May 2003, Miller received conflicting instructions regarding his CSD reporting duties from his supervisor, Captain Debra Davidoski. (Davidoski had replaced Haynes in April 2002, when Haynes was transferred to Criminal Investigations.) On May 16, Davidoski complained to Deputy Chief Schunk about Miller's performance, and

within two weeks Miller was transferred to patrol duty. At the time, Chief Jones explained the transfer to Miller's new commanding officer, stating he had overstepped his duties with PAL. In the months following the transfer, however, internal performance evaluations were submitted that brought this comment, and thus the motivation for his transfer, into serious doubt.

After Miller's transfer, Sergeant Banks assumed the Program Director's role and did everything Miller had previously done as Executive Director. This included hiring and firing civilian employees, directing officers, handling PAL finances, and attending and voting at Board meetings. The curtailment of Miller's involvement in PAL also affected community interaction with the organization. As Miller's role was reduced, community and officer involvement dropped off, and when he was transferred, key financial backers stopped donating.

At the close of discovery, Chief Jones moved for summary judgment. He argued there were no material facts in dispute and that he was entitled to qualified immunity as a matter of law. Judge Curran denied summary judgment on the question of law and Jones now appeals pursuant to 28 U.S.C. § 1291.

## II. DISCUSSION

Summary judgment is appropriate only where the moving party demonstrates "there is no genuine issue as to any material fact and that [they are] entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When determining whether a genuine issue of material fact exists, this Court considers evidence in the light most favorable to the non-moving party. *See Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Bell v. Environmental Protection Agency*, 232 F.3d 546, 549 (7th Cir. 2000). Because there is no dispute as to the material facts, we

focus below on the matters of law regarding the defendant's claim of qualified immunity.

Government officials enjoy qualified immunity, and are thus shielded from civil liability, "'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Schad v. Jones*, 415 F.3d 671, 673 (7th Cir. 2005) (citing *Andersen v. Creighton*, 483 U.S. 635, 638 (1987)). To determine whether an official is entitled to qualified immunity we look to two issues. First, taken in a light most favorable to the party asserting the injury, the facts must show the official violated a constitutional right. *Finsel v. Cruppenink*, 326 F.3d 903, 906 (7th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)). Second, we look to see if the right was "clearly established at the time of the alleged violation." *Id.* (citing *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603 (7th Cir. 2002)). To be "clearly established," the right in question must be

> sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 640 (citation omitted). For a right to be clearly established, however, we need not have a prior case that is founded on materially similar facts; officials may still be on notice in "novel factual circumstances." *Finsel* at 906 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

The district court's denial of defendant's motion for summary judgment on qualified immunity is immediately appealable under 28 U.S.C. § 1291. *See Delgado v. Jones*,

282 F.3d 511, 514 (7th Cir. 2002). Our review of summary judgment motions in this context is *de novo. See Saffell v. Crews*, 183 F.3d 655, 657 (7th Cir. 1999).

### A.  Protected Speech.

Regarding the first prong of our qualified immunity analysis, Miller claims that Jones transferred him from the Community Services Division to patrol duty in retaliation for speech that was protected by the First Amendment pursuant to 42 U.S.C. § 1983. Government employees do not lose the right to comment as citizens on matters of public concern as an incidence of their employment. *City of San Diego v. Roe*, 125 S.Ct. 521, 523 (2004). To establish a claim for retaliatory transfer, the plaintiff must demonstrate that the statement at issue was constitutionally protected, and was a substantial, or motivating, factor in the transfer. *Schad*, 415 F.3d at 674 (citing *Brooks v. Univ. of Wis. Bd. of Regents*, 406 F.3d 476, 479 (7th Cir. 2005)). If these two elements are established, the burden shifts to the government to prove that their interest in efficient management outweighed the plaintiff's interest in freedom of expression, or that they would have taken the action regardless of the statement. *See Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002). Jones argues that Miller's claim fails because he did not speak on a matter of public concern.

To be protected, employee speech must relate to a matter of "political, social, or other concern to the community. . . ." *Connick v. Myers*, 461 U.S. 138, 146 (1983). *Connick* held that when an "employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest . . . a federal court is not the appropriate forum in which to review the wisdom of the personnel decision taken by a public agency. . . ." *Id.* at 147. To determine whether the employee's speech was that of a

citizen on matters of public concern, we look to the content, form, and context of the statement.[1] *Connick*, 461 U.S. at 147-48; *Schad*, 415 F.3d at 674. Of these three, content is the most important. *Gustafson*, 290 F.3d at 907. In evaluating these factors, we look to whether the government employee sought to "bring to light actual or potential wrongdoing or breach of public trust." *Connick*, 461 U.S. at 148. Further, not all matters that transpire in a government office are of public concern. *Id*. at 149. Instead, public concern is the "subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public . . . ." *San Diego*, 125 S.Ct. at 525-26. Whether the statement rises to the level of public concern is a question of law. *Connick*, 461 U.S. at 148, n.7.

Taking the facts in a light most favorable to the plaintiffs, as we must, the content of the speech at issue covers more

---

[1] Defendant directs our attention to Judge O'Scannlain's concurrence in *Ceballos v. Garcetti*, 361 F.3d 1168, 1185 (9th Cir. 2004), *cert. granted*, 125 S.Ct. 1395, 126 S.Ct. 1294 (Feb. 17, 2006). In *Ceballos,* the Ninth Circuit majority held that speech made by a public employee was protected when it touched on a matter of public concern. *See id.* In contrast, Judge O'Scannlain reasoned that *Connick's* primary focus was not on whether the employee's speech touched on a matter of public concern, but whether the employee spoke as a *citizen* on a matter of public concern. *Id*. at 1187-88. We note that the most recent Supreme Court opinion to consider the matter, *City of San Diego v. Roe*, focused on whether the matter was one of "public concern," not whether the employee's speech was made as a citizen. 125 S.Ct. 521, 523-26 (2004). Our opinions, however, consider the question in full, seeking to determine whether the employee spoke "as a citizen on a matter of public concern" while in the employee context. *See Gonzalez v. City of Chicago*, 239 F.3d 939, 941-42 (7th Cir. 2001); *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2001); *Schad*, 415 F.3d at 674. It is the examination of the content, form, and context of the speech that determines this fact.

than a dispute over internal office affairs, and would be of legitimate news interest. Matters of police protection and public safety are generally topics of public concern. *Schad*, 415 F.3d at 675 (internal quotation omitted). Yet, we must go beyond this blanket observation and review the precise content of Miller's speech. *Id.* Our cases have consistently held that speech alleging government malfeasance addresses matters of public concern in its substance. *Spiegla v. Hull*, 371 F.3d 928, 937 (7th Cir. 2004) (collecting cases). But the communication and content must connect in a way that creates a "communicative element" putting the listener on notice that a matter of public concern is being raised. *Schad*, 415 F.3d at 675. This connection was found lacking in *Schad*, where the plaintiff police officer merely relayed a suspect's whereabouts without going through proper police channels. *See id.* at 675-78. The connection, however, was present in *Spiegla*, where the plaintiff correctional officer questioned the suspicious conduct of her superiors who appeared to be using a new search policy to facilitate unlawful behavior. *Id.* at 675-77.

In this case, Miller opposed the proposed merger because it left the MPD officers without a facility to host PAL activities, thus reducing the quality of community interaction and opportunity to interact with city youth in an indirect law enforcement capacity. Further, the Boys and Girls Club offered only enough funding to cover their own operating costs, but nothing to offset the debt incurred in construction. This outcome likely violated PAL's national bylaws, cutting them off from receiving national funding, and implicated the integrity of the fund-raising and construction process that Miller had overseen in PAL's name. Chief Jones argues that there was nothing wrong in his proposal of this merger. While this may be true, the proposal is not the sole issue under discussion. There is also the matter of the pressure Chief Jones brought to bear on the PAL Board to ensure that the proposal was accepted.

Despite open concerns, Chief Jones pushed the merger forward, leveraging his control over MPD personnel through the threat and implementation of job transfers. By January 2003, Miller's speech had expanded to include concerns about Jones's coercive behavior, and the effect it had on PAL.

Miller also raised questions about the quality of work being done on the new facility and certain financial transactions that implicated PAL's attorney and Wisconsin State Senator George. These statements touch on the propriety of fiscal management by government officials of a financially independent community organization, and were not limited, like *Schad*, to ordinary matters of purely internal operation. These were no mere hypothetical concerns; Senator George was later indicted on numerous counts, including charges on this matter, and pleaded guilty to receiving kickbacks (18 U.S.C. § 371, conspiracy to defraud the United States) in another scheme involving PAL's attorney. *See United States v. George*, 403 F.3d 470 (7th Cir. 2005).[2]

We find it hard to imagine that the Milwaukee public would not be concerned with the Chief of Police using his official position to coerce a financially independent organization into a potentially ruinous merger. This concern seems particularly acute when the Chief served on the Board of Directors of both organizations. Or that the public would not take an interest in their elected representatives' misappropriation of monies intended for their benefit. Indeed, the *Milwaukee Journal Sentinel* eventually covered portions of the scheme. Tr. Rec. 50, Ex. E.

The form of Miller's speech also indicates that the matter was one of public concern. After raising his concerns with the PAL Board and MPD, he filed a citizen's complaint with

---

[2] The conviction is a matter of public record. *See United States v. George*, No. 03-CR-259 (E.D. Wis. Aug. 11, 2004) (judgment).

the Fire and Police Commission. Short of racing to the nearest television or radio station, we are hard-pressed to find a more public form of speech than his reporting to this civilian staffed body. This form of communication stands in marked contrast to the internal memos circulated in *Connick* or *Gonzalez*, or the procedural officer-to-officer call placed in *Schad*. Miller's actions explicitly and formally sought to alert a greater audience of the possible harm at issue. Regarding his statements on the financial irregularities and construction problems, this matter again mirrors *Spiegla*. While Miller may not have been as public with these concerns, he raised the issues on his own volition in multiple venues, first with Chairman Harris and then again with Deputy Chief Schunk. These attempts, when matched with the inherent value of the content, are sufficient to raise the underlying speech to the level of a public concern. *See Spiegla*, 371 F.3d at 937-38.

Finally, we consider the context of the speech at issue, evaluating Miller's motive and circumstances. *See Schad*, 415 F.3d at 676 (citation omitted). While a statement born of pure personal interest does not constitute a public concern, a mere personal aspect of the speaker's motivation will not defeat the entire speech. *See Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999). Jones argues that the plaintiff was motivated purely by personal concern in that he was only interested in preserving his autonomy and job at PAL. While the scope of Miller's authority at PAL had been curtailed at Jones's demand during the months leading up to his complaint, Miller continued to work with the organization as the Program Director and maintained his job with the MPD Community Services Division. Jones has failed to offer any evidence indicating that Miller's status with the former was directly linked to his assignment with the latter. Moreover, Miller's repeated statements to the Board addressed the negative impact of the merger on the opportunity for MPD officers to interact with the community and that the Boys and Girls Club offered no

financial support for the outstanding debt on the newly constructed facility. Being financially independent, PAL would retain the liability for this debt, but have no facility to show for it or to aid in subsequent fund-raising. Similarly, his complaint with the Commission alleged Chief Jones violated MPD Rules and Regulations in his attempts to govern the decision of the PAL Board. This stands in opposition to a situation like that in *Kokkinis*, where the plaintiff officer used an ancillary matter of public concern as an opportunity to voice his purely personal grievances with his employer. 185 F.3d at 844.

Regarding the circumstances of his speech, Jones claims that Miller's statements were not protected because they were within the scope of his regular job duties. As initially noted in *Gonzalez*, and clarified in *Delgado*, statements made in the course of the "routine discharge of assigned functions, where there is *no suggestion of public motivation*" do not indicate that the employee set out to speak as a citizen on matters of public concern. *See Spiegla*, 371 F.3d at 939 (emphasis added); *Gonzalez*, 239 F.3d at 941; *Delgado*, 282 F.3d at 519. Where, as is the case here, the statement at issue arose from a discretionary act involving independent judgment and action, the speech is more likely to suggest the employee spoke as a citizen on a matter of public concern. *See Delgado*, 282 F.3d at 519. Miller's opposition to the proposed merger may hardly be said to be a routine discharge of his duties as an officer with the MPD Community Services Division. His judgment on the matter followed noted consideration of PAL's national bylaws and was informed by his understanding and experience of the organization's structure, operation, and financial obligations. While he may have been required to undertake this review, he was not required to recommend a particular outcome. This stands in marked contrast to our finding in *Gonzalez* where the plaintiff could have been punished for not making the statements at issue there. 239 F.3d at 941-

42. Nothing before us indicates that Miller may have been punished for not opposing the merger. In fact, Miller was investigated by the MPD Internal Affairs Division for discussing the matter with Chairman Harris and the PAL board, an action which was part of his duties as the MPD liaison to the organization.

Additionally, Miller's January 2003 statements on the financial irregularities and contractor performance put both the MPD and the PAL Board on notice regarding missing funds and possible breach of contract. While monitoring these issues was part of his prior duties as Executive Director and Treasurer, he had been demoted to Program Director and restricted from holding "any other positions" per Chief Jones's November 15, 2002, letter to the Board. Tr. Rec. 50, Dep. Ex. 17. Managing construction and auditing PAL's finances are not listed in the Program Director's job description. *Id.* At most, Miller was responsible for preparing and monitoring the budget with the Managing Director and reporting to the Board Finance Committee. Given this precise and newly limited job description, we cannot find that Miller's subsequent and consistent reporting on these issues was wholly within the scope of his duties. The present scenario is similar to that of *Spiegla*, where the plaintiff was responsible for implementing prison security policies, but took it upon herself to question her superiors' policy change that may have decreased security. *See Spiegla*, 371 F.3d at 939. We held this questioning was not part of her core functions and was akin to a citizen raising a matter of public concern. *Id.* Similarly, where Miller was instructed to act through the Managing Director and "[m]aintain confidentiality of all information" he chose instead to bring his concerns to his supervisors in both PAL and the MPD. Tr. Rec. 50, Dep. Ex. 17, p.2. To claim this speech was entirely within the scope of his job duties and not a matter of public concern "sweeps much too broadly." *Spiegla*, 371 F.3d at 939.

Lastly, Jones argues that Miller's speech did not touch on matters of public concern because PAL was not part of the core duties of the Milwaukee Police Department. In support of this argument he cites *Gardetto v. Mason*, 100 F.3d 803 (10th Cir. 1996), where our sister court held that speech protesting the reorganization of an adult reeducation center, one that was wholly funded by the state college employer-defendant, was not a matter of public concern because the decision did not affect the "primary mission of the college." *Id.* at 815. First, we note that this focus on a government employer's primary mission plays no dispositive role in our public concern jurisprudence. Second, *Gardetto* involved the reorganization of an entity wholly funded by the defendant-employer. Here, Chief Jones used his control over governmental employees to affect the management of an independently financed organization in favor of another organization with which he also served, in possible contravention of Milwaukee Police Department Rules and Regulations. When a government official acts, he has a responsibility to obey the rules that bind him. The potential breach of these regulations is itself a matter of public concern. Additionally, PAL's purpose was to create a parallel connection between the MPD and the community to aid and support the Department's everyday safety and outreach operations. Sound connections to the community allow for effective policing, which is the goal, and concern, of the MPD. We affirm the decision of the district court on this issue.

## B. Prior Decisions on Matters of Public Concern.

While we find that Miller's speech rises to the level of public concern, Chief Jones's actions would still be protected were this constitutional violation not "clearly established" at the time of the alleged conduct. *Finsel*, 326 F.3d at 906 (citation omitted). It is well established by the Supreme

Court and this circuit that a public employer may not retaliate against an employee who exercises his First Amendment speech rights. *See Connick*, 461 U.S. 138. This prohibition extends to retaliatory transfers to a less desired position. *see Delgado*, 282 F.3d 511; *McGill v. Bd. of Educ. of Pekin Elem. Sch. Dist. 108*, 602 F.2d 774 (7th Cir. 1979).

Defendant argues that rights in this area are not clearly established, and that the Supreme Court's decision in *City of San Diego v. Roe* proclaims as much. In *San Diego*, the Supreme Court wrote that "[a]lthough the boundaries of the public concern test are not well-defined, *Connick* provides some guidance . . . [i]t directs courts to examine the 'content, form, and context of a given statement, as revealed by the whole record. . . .'" 125 S.Ct. at 525. It is this three-part examination that our cases have applied since *Connick* was handed down. *See, e.g.*, *Yoggerst v. Hedges*, 739 F.2d 293 (7th Cir. 1984). To leap from the simple observation that the boundaries of what constitutes public concern require some searching, to the argument that after *San Diego* "no reasonable law enforcement official" may be expected to determine what is appropriate behavior in this realm, is a step too far. Nothing in *San Diego* reformed the core of our jurisprudence on the matter.

Nor did *San Diego* strike down *Delgado*, where we held that employee speech on a matter of public concern was protected under the First Amendment, and therefore protected against retaliatory transfers, when it grew out of some discretionary act. *See* 282 F.3d at 516-21. For examples of similar factual scenarios, Chief Jones may have turned to our holding in *Campbell v. Touse*, where we held that a police officer's speech criticizing the management of a community-oriented policing program was a matter of public concern. *See* 99 F.3d 820 (7th Cir. 1996). Additionally, Jones may have turned to *Knapp v. Whitaker*, wherein we held a public school teacher had spoken on a matter of public concern when protesting an inequitable reimburse-

ment scheme for expenses incurred in coaching students. *See* 757 F.2d 827 (7th Cir. 1985). The core of the public concern in *Knapp* was the misuse of funds intended for the school's athletic program; a secondary mission of the school system, to be sure. *Id.* at 840-41. Finally, should former Chief of Police Jones have needed personal notice that the retaliatory transfer of public employees for speech protected by the First Amendment is subject to suit under § 1983, he need only look to our holding in *Octavio Delgado v. Police Chief Arthur Jones and Deputy Chief Monica Ray*, 282 F.3d 511, Mar. 8, 2002, decided against the appellant himself in the same month during which the merger was first proposed.

### III.  CONCLUSION

For the foregoing reasons we AFFIRM the judgment of the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*